# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Benjamin D. Meir,

              Plaintiff,

        v.

Jeffrey McCormick, acting in his
individual and official capacity as
Chief of the Chatfield Police
Department, and the City of Chatfield,

              Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 06-190 ADM/JSM

_____

Robert Bennett, Esq. and Andrew J. Noel, Esq., Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, on behalf of Plaintiff.

Jason M. Hiveley, Esq., Iverson Reuvers, LLC, Bloomington, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On March 13, 2007, oral argument before the undersigned United States District Judge was heard on Defendants Jeffrey McCormick ("McCormick") and the City of Chatfield's ("the City") (collectively "Defendants") Motion for Summary Judgment [Docket No. 12]. In his Complaint [Docket No. 1], Plaintiff Benjamin D. Meir ("Meir") alleges that McCormick used excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983. Meir also alleges a Monell claim against the City. For the reasons set forth below, Defendants' Motion for Summary Judgment is denied.

## II. BACKGROUND[1]

### A.     Initial Incident

On August 13, 2005, Ben Meir attended Chatfield, Minnesota's Western Days celebration with friends Keith Allen, Alex Timm, Ryan Bakken ("Bakken"), Ben Stevens, and Zachary Lois ("Lois").  Meir Dep. (Hiveley Aff. [Docket No. 16] Ex. B) at 16-17, 23-24.  Lois is a Marine.  Id. at 64.  At 11:00 p.m., Meir and his friends attended a concert at the local fairgrounds.  Id. at 26.  While at the concert, Meir consumed six, eight-ounce glasses of beer.  Id. at 27-28.  After the concert, Meir and Lois, separated from the rest of their friends, left the fairgrounds and arrived at the Coyote Club bar around 1:00 a.m.  Id. at 29-30.  While at the Coyote Club, Meir had two, sixteen-ounce glasses of beer and one "Jack and coke."  Id. at 30. Meir agrees that he was probably legally drunk.  Id. at 32.

At around 1:30 a.m., the Coyote Club had "last call" and began clearing people from the bar in advance of closing time at 2:00 a.m.  Id. at 30, 34.  Meir and Lois left the Coyote Club and waited outside on the sidewalk, hoping to reunite with friends.  Id. at 34, 40.  Approximately 20 to 40 other people were standing outside the bar.[2]  Derouin Dep. (Bennett Aff. [Docket No. 20] Ex. 5) at 47, 68; Newgarden Dep. (Bennett Aff. Ex. 4) at 66, 72-74; Bakken Dep. (Hiveley Aff. Ex. C) at 37; Bennett Aff. Ex. 3.  While waiting, Lois leaned against or sat on a silver Ford Mustang parked immediately outside the bar.  Meir Dep. at 41-44; Newgarden Dep. at 22-23, 27. The car was owned by Christopher Newgarden ("Newgarden"), a Coyote Club bouncer.

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

[2] The actual number of people outside and whether or not the crowd was "hostile" is a highly disputed fact.

Newgarden Dep. at 4, 22-23.  Upon observing Lois, Newgarden left his post at the Coyote

Club's door and asked Lois to get off his car, which Lois did.  Id. at 27; Meir Dep. at 44-46.  A

few minutes later, Lois again leaned against or sat on Newgarden's Mustang.[3]  Meir Dep at 46-

47; Newgarden Dep. at 28-29.  Newgarden again came out of the bar and told Lois to get off his

car.  Meir Dep. at 49; Newgarden Dep. at 30-31.  Meir told Newgarden to "chill out" because his

car was not "that nice of a car," and it was a "piece of shit."  Meir Dep. at 49-52; Newgarden

Dep. at 27.

Shortly after the verbal exchange between Meir and Newgarden, Jesse Derouin

("Derouin"), a Coyote Club bartender who was not wearing a shirt, came out of the bar to aid

Newgarden.  Derouin Dep. at 5-6, 17-18; Newgarden Dep. at 33; Meir Dep. at 55.  Derouin is an

"ultimate fighter."[4]  Derouin Dep. at 21-22.  Derouin and Newgarden told Lois and Meir to

leave.  Id. at 25.  Lois and Derouin exchanged words and then got into a physical altercation.  Id.

at 29; Meir Dep. at 55-56.  Derouin avers that he initiated the physical contact by pushing Lois

and then they began "wrestling around."  Derouin Dep. at 29, 32; Meir Dep. at 55-56, 64.

Derouin also punched Lois in the face.  Derouin Dep. at 33; Meir Dep. at 55-56.

Meir attempted to break up the fight and to pull Derouin away from Lois.  Meir Dep. at

57-59.  At the same time, people in the crowd grabbed Meir and tried to pull him away from the

fight.  Id. at 57, 60-61; Derouin Dep. at 43, 48.  Meir avers that he and Derouin never punched

---

[3] Newgarden avers that at Meir's urging, Lois jumped and landed on his rear end on the
hood of the Mustang.  Newgarden Dep. at 28-29.

[4] Ultimate fighting "is defined as mixed martial arts competition between high level
professional fighters who utilize the disciplines of jiu-jitsu, karate, boxing, kickboxing,
wrestling, and other forms in [Ultimate Fighting Championship] live events."  Ultimate Fighting
Championship Official Website, http://www.ufc.com/index.cfm?fa=LearnUFC.FactSheet.

one another.  Meir Dep. at 57, 60.  Derouin avers that Meir came at him with his "arm cocked

back," and that Derouin ducked and punched Meir in the face.  Derouin Dep. at 30-31;

Newgarden Dep. at 80.  Derouin also states that neither Lois nor Meir punched him, and that he

was not hurt at all.  Derouin Dep. at 37-38.

**B.      Chief McCormick's Involvement**

When the fight began, Chief McCormick was standing approximately fifty feet away

outside the Coyote Club.  McCormick Dep. (Hiveley Aff. Ex. D) at 24, 44, 132.  He was alone,

on foot, and in uniform.  Id. at 36, 39.  McCormick began moving toward the individuals as the

fight began, and avers that he first saw Lois grab Derouin around the neck and put him in a

headlock.  McCormick Dep. at 42-44; Bennett Aff. Ex. 3.  McCormick avers he never saw

Derouin or Lois punch anyone.  McCormick Dep. at 44.  McCormick also claims that he saw

Meir "go up against the backs of two unknown males and start punching at Lois or Derouin with

a closed fist over their heads."  Id. at 45; Bennett Aff. Ex. 3.  When McCormick approached the

fighters, he grabbed Meir from behind around his arms and body, at the same time that other

individuals were grabbing Meir.  McCormick Dep. at 49, 60-63; Bakken Dep. at 30, 49; Derouin

Dep. at 40; Bennett Aff. Ex. 3.  McCormick had not yet identified himself as a police officer, and

Meir attempted to jerk away.[5]  McCormick Dep. at 60-64; Bakken Dep. at 30; Bennett Aff. Ex.

3.  McCormick then identified himself as a police officer and told Meir to stop.  McCormick

Dep. at 64; Bennett Aff. Ex. 3.  Meir heard McCormick say "police officer," turned around, saw

that McCormick was holding his arm, and immediately stopped struggling.  Meir Dep. at 62-63,

---

[5] Newgarden claims that Meir turned around and took a swing at McCormick.
Newgarden Dep. at 36-37.

66-69; McCormick Dep. at 64; Bennett Aff. Ex. 3.

McCormick pushed Meir approximately five to twenty feet away from the fight between Lois and Derouin. Meir Dep. at 69, 72-73; Bakken Dep. at 36; Bennett Aff. Ex. 3. McCormick gave Meir instructions such as "get down on the ground" and "stop resisting." Derouin Dep. at 40; Newgarden Dep. at 46; Bakken Dep. at 30, 32-33. McCormick told Meir to put his hands behind his back and Meir did so. McCormick Dep. at 64; Bennett Aff. Ex. 3. Meir started arguing with McCormick, explaining that he was breaking up the fight and Derouin was the instigator. Meir Dep. at 73, 79; Bennett Aff. Ex. 3. Meir also may have been swearing at McCormick. Meir Dep. at 79. McCormick placed Meir in handcuffs.[6] Id. at 80. McCormick claims that Meir was resisting arrest by pulling away, trying to turn his body, and kicking his legs. McCormick Dep. at 84-86; Bennett Aff. Ex. 3; see also Derouin Dep. at 77. Meir claims that once McCormick identified himself as a police officer, he stopped resisting. Meir Dep. at 77-78; see Bakken Dep. at 53-54

Shortly after Meir was handcuffed, McCormick used a decentralization technique to take Meir to the ground. Meir Dep. at 80-81; McCormick Dep. at 56; see Newgarden Dep. at 37-40. A decentralization technique involves taking an individual off balance so that he can be stabilized against a structure. McCormick Dep. at 56. McCormick placed his leg in front of Meir's leg, shifted his weight forward against Meir's upper body, and drove Meir's upper body

---

[6] McCormick avers that he did not handcuff Meir until after Meir was on the ground. McCormick Dep. at 55-56, 67-68. Newgarden claims that he saw McCormick handcuff Meir after Meir was already on the ground. Newgarden Dep. at 36. Bakken now can not remember if McCormick handcuffed Meir before or after McCormick took Meir to the ground, but in a statement given shortly after the incident, Bakken claimed that Meir was handcuffed before he was taken to the ground. Bakken Dep. at 30-32, 52. Brent Koons avers that Meir was handcuffed before he was taken to the ground. Koons' Statement (Bennett Aff. Ex. 1).

ahead of his legs so that Meir fell to the ground.  Id. at 57; see Bakken Dep. at 30.  Because

Meir's hands had been previously handcuffed behind his back, Meir was unable to break his fall

with his hands.  See McCormick Dep. at 69; Bakken Dep. at 49-50.  Meir fell face first to the

pavement.  Meir Dep. at 81-83; see McCormick Dep. at 73; Bakken Dep. at 30.  McCormick

claims he "was forced by Meir's actions to take him to the ground in order to gain control of

him."  McCormick Dep. at 86; Bennett Aff. Ex. 3.

        At the same time that Meir was being taken down by McCormick, Lois was held down

by Derouin and others until the police could take over.  Derouin Dep. at 35, 39-40; Newgarden

Dep. at 51-53.  Derouin avers that after both Lois and Meir were restrained, he "went back inside

the bar right away and started cleaning up."  Derouin Dep. at 54.

## C.     Koons' Observations

        At the time of the incident, Brent Koons ("Koons"), age 20, was living at the Shady Oak

Camp Ground in Chatfield while he worked as a crane operator on a project at the Chatfield

Waste Water Treatment Plant.  Koons' Statement at 1.  At bar closing time, Koons was parked

near the Coyote Club and waiting in his car to give his brother a ride home.  Id.  Koons avers

that he does not drink.  Id.  While waiting for his brother, Koons observed the fight in front of

the Coyote Club.  Id.  Koons has testified a large, shirtless man punched at two other men who

had been standing by a silver Mustang.  Id.  Koons observed that the two men were not fighting

back and were just trying to get away from the shirtless man.  Id.  Koons next observed a man

come up behind the shirtless man and attempt to restrain the shirtless man.  Id. at 2.  Koons later

learned that the restraining man was Ben Meir.  Id.  Koons next observed a police officer

approach Meir and place him in handcuffs.  Id.  Koons avers that Meir "did not resist and

appeared to do everything the officer was instructing him to do.  I saw him voluntarily place his hands behind his back while the officer handcuffed him." Id.  Koons next states:

> The officer, who was holding Meir by the handcuffs with his right hand, began to lead Meir away.  I was shocked to see what occurred next.  The officer intentionally stepped with his right foot in front of Meir and tripped him.  With his hands cuffed behind his back Meir fell face first onto the pavement.  The officer then came down on the back of Meir with his knee.  I could not believe what I had just witnessed.  There was no doubt this was a blatantly intentional act.  I could see Meir had blood coming from his mouth.  Later, there was a sizeable puddle of blood on the ground where Meir had fallen.

Id.

Koons has testified that he did not want to get involved, but felt compelled to approach the officer and tell the officer he was arresting the wrong man.  Id.  When he approached the officer and told him what he had seen, the officer told Koons that he had observed Meir punch someone from behind and kick the person while on the ground.  Id. at 2-3.  The officer did not ask for Koons' name or request that he make a statement.  Id. at 3.  Koons attempted to approach a second officer to explain what he saw.  Id.  Koons can be heard on a tape recording from the officer's police vehicle saying:

> You guys . . . really man, I mean I don't . . . it's none of my business . . . don't get me wrong.  I'm not trying to cause nothing.  I met . . . I talked to you, remember, when I first came into town?  I was looking for that Shady Oak? . . . Okay.  He didn't do a thing, man. . . . Darn well watched the whole thing . . . happen.  I had to move my . . . foot.  I just barely moved my (inaudible) before this (inaudible) slammed into it . . . a big stocky guy.  A big stocky guy with no shirt on, he started that whole rile (inaudible). . . . This guy, he didn't do . . . he didn't do . . .

Bennett Aff. Ex. 14 at 11-12.  The second officer told Koons that "he was simply a backup officer and had not witnessed any portion of the incident."  Koons Statement at 3.  Koons avers that the shirtless man was allowed to walk away and was not arrested.  Id.  Koons avers that he does not know and has never met any of the people involved in the incident, yet he "feel[s]

compelled to come forward and tell what I saw." Id.  Brent Koons' name does not appear in any of the police reports of the incident.  McCormick Dep. at 115-16.

**D.    Meir's Injuries and Charges**

McCormick radioed for an ambulance, and paramedics arrived to treat Meir's injuries. Meir Dep. at 84; McCormick Dep. at 88; Bennett Aff. Ex. 2.  Meir was transported by ambulance to St. Mary's Hospital where emergency surgery was performed in an attempt to save Meir's front tooth, which was completely knocked out when Meir hit the ground.  Meir Dep. at 89-90.  The surgery to restore the tooth was unsuccessful. Id. at 92; Bennett Aff. Ex. 10.  Meir also suffered two cracked teeth which ultimately died, five facial fractures and one nasal fracture, a split lip and chin, scrapes on his neck and face, and bruising and swelling.  Meir Dep. at 90-91, 106-09; Bennett Aff. Ex. 10.

After the incident, McCormick asked Matt Opat, a city attorney for Chatfield, to charge Meir by criminal complaint with assault on a police officer, obstruction of legal process with force, and disorderly conduct.  Meir Dep. at 124-25; McCormick Dep. at 79-80; Bennett Aff. Ex. 18.  Derouin was not charged with any crime and was identified as the victim of Meir's conduct. McCormick Dep. at 120; Derouin Dep. at 68.  Meir's case was transferred to the Fillmore County Attorney's office, and Meir agreed to plead guilty to disorderly conduct in exchange for the dismissal of the charges of assault on a police officer and obstruction of legal process with force.  Meir Dep. at 124-25, 135; McCormick Dep. at 81-83; Bennett Aff. Ex. 22.

**E.    Liability Policy**

The Chatfield Police Department's Policy and Procedure Manual's Use of Force policy contains Policy No. 1.01.22.09 entitled "Performance Objectives to Minimize Liability."

8

Hiveley Aff. Ex. E.  The Policy states:

> Officers must recognize that liability, today, is a very real fact of life.  Despite it's prev[a]lence, not every officer becomes party to litigation.  There are characteristics and habits that mark professional performance that can limit an officer[']s exposure almost entirely.

> Officers of the Chatfield Police Department will recognize that peak performance limits liability, and that the following list of characteristics are desir[]able.

***

- Prepare All Official Reports With Your Legal Risks In Mind

- Provide Information That Counters the Tactics of Adversarial Attorneys

- Articulate Details & Perceptions That Defend[ ] Your Position

***

- Do & Say Things That Will Make You Win On The Street & In Court

Id.

# III. DISCUSSION

## A.    Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

9

allegations or denials, but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial." <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Qualified Immunity**

McCormick seeks the protection of qualified immunity.  McCormick argues that his use

of force under the circumstances was objectively reasonable because he was in the midst of a

large, hostile crowd; there was an ongoing fight nearby; Meir was attempting to engage the fight;

and Meir was actively resisting arrest.  McCormick relies on a number of cases for the

proposition that Meir's significant injuries do not necessarily lead to the conclusion that

unreasonable and excessive force was used.  McCormick also argues that there is no clearly

established rule that would prohibit him from taking Meir to the ground in a situation where he

was surrounded by a large group of people, Meir was resisting arrest, and Meir was continuing to

yell obscenities toward the fight.

Meir responds that for purposes of this Motion, the Court must accept as true the

following facts: once McCormick identified himself as a police officer, Meir stopped resisting;

Meir allowed himself to be handcuffed and led away from the fight by McCormick; Meir did not

attempt to escape; and McCormick was not being threatened by anyone or otherwise at risk.

Meir argues that under the factors established in <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989),

the use of force by McCormick was excessive and objectively unreasonable because Meir was

convicted of only the lesser misdemeanor offense of disorderly conduct, Meir was handcuffed

and removed from the fight, and Meir was compliant with McCormick and not resisting arrest.

Meir also argues that at the time McCormick slammed him to the ground, it was clearly

established that a police officer may not use deadly force on a handcuffed, non-resisting

10

misdemeanant.  Meir also argues that pursuant to <u>Henderson v. Munn</u>, 439 F.3d 497, 503-04 (8th

Cir. 2006), material factual disputes preclude summary judgment and a jury might not find

McCormick's testimony to be credible in light of other evidence.

In <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001), the Supreme Court clarified the

standard courts must apply in conducting the qualified immunity analysis.  The first question is

whether, taken in the light most favorable to the plaintiff, the facts alleged show the officer's

conduct violated a constitutional right.  <u>Id.</u> at 201.  If the answer to the first question in the

qualified immunity analysis is yes, then the second question is whether the constitutional right at

issue was clearly established.  <u>Id.</u>  "Whether a given set of facts entitles the official to summary

judgment on qualified immunity grounds is a question of law."  <u>Greiner v. City of Champlin</u>, 27

F.3d 1346, 1352 (8th Cir. 1994).

### 1.      Constitutional Violation

Meir alleges that McCormick used excessive force to effect his arrest in violation of the

Fourth Amendment of the United States Constitution.  In analyzing an excessive force claim,

whether McCormick's actions were objectively reasonable in light of the facts and circumstances

confronting him must be assessed, without regard to his underlying intent or motivation.

<u>Graham</u>, 490 U.S. at 397.  In order to determine whether the force used to effect Meir's seizure

was reasonable under the Fourth Amendment, the Court is required to carefully balance "the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake."  <u>Id.</u> at 396 (citation and internal quotation marks

omitted).  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the

right to make an arrest or investigatory stop necessarily carries with it the right to use some

11

degree of physical coercion or threat thereof to effect it." Id.  Courts are to consider all the facts

and circumstances of the particular case, "including the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." Id.  "The 'reasonableness' of a

particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." Id.  "The calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary in a particular situation." Id.

   McCormick argues that his actions in taking Meir to the ground were objectively

reasonable under the circumstances given that a large crowd had formed, Meir was resisting

arrest, and Meir was not yet handcuffed and under control.  However, the facts are evaluated in

the light most favorable to Meir on summary judgment.  See Henderson, 439 F.3d at 503;

Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005).  Meir alleges that he was not participating

in the fight but rather was trying to pull Derouin away from Lois after Derouin punched Lois in

the face.  Meir Dep. at 55-59.  Meir claims that he initially tried to jerk away from the hands

restraining him, but after he heard McCormick identify himself as a police officer, Meir stopped

struggling and complied with McCormick's directions.  Id. at 62, 66-69, 77-78.  Meir avers that

McCormick pushed him away from the fight and placed him in handcuffs.  Id. at 69, 72-74, 80-

81.  Meir alleges he was not trying to resist arrest but was trying to explain to McCormick that

McCormick had grabbed the wrong man.  Id. at 73, 77-79  Meir also avers that the only people

fighting were Derouin and Lois.  Id. at 60.  Meir's version of the facts is corroborated in all

significant aspects, including Meir's being in handcuffs at the time of the take down, by witness

Koons, who has no known interest in the case.

Taking all of the facts in the light most favorable to Meir, McCormick's use of force was

not objectively reasonable under the circumstances.  Meir was not engaged in any serious

criminal activity but rather was trying to break up a fist fight.  After McCormick pushed Meir

away from the fight and handcuffed Meir, Meir did not pose any immediate threat to the safety

of officers or others because McCormick had Meir under control and Meir was not resisting

arrest.  In light of these facts and circumstances, it was objectively unreasonable and excessive

for Officer McCormick to push Meir off balance and take him to the ground face first when Meir

had no way to brace himself or break his fall.  Under the facts as alleged by Meir, McCormick

placed Meir under his control and there was no need for the excessive action of taking Meir to

the ground on his face.

### 2.    Clearly Established

To determine whether a particular right was clearly established, it must be viewed in a

particularized, relevant sense: "The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right."  Anderson v.

Creighton, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by

qualified immunity unless the very action in question has previously been held unlawful, but it is

to say that in the light of pre-existing law the unlawfulness must be apparent."  Hope v. Pelzer,

536 U.S. 730, 739 (2002) (internal citation omitted).  "Although earlier cases involving

'fundamentally similar' facts can provide especially strong support for a conclusion that the law

is clearly established, they are not necessary to such a finding."  Id. at 741.  "The relevant,

dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

It is clearly established from a generalized perspective "that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Id. at 201-02. However, a review of relevant case law reveals that it is also true that, when viewed in a more particularized sense, it would be clear to a reasonable officer, in light of pre-existing law, that McCormick's actions were unlawful in the situation he confronted.  See, e.g., Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004) (holding that using pepper spray on an individual after he is handcuffed and hobbled is excessive, and that putting significant pressure on an individual's back while he is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force); Young v. Prince George's County, Maryland, 355 F.3d 751, 757-58 (4th Cir. 2004) (holding that a reasonable jury could find excessive placing a suspect in a headlock and throwing him head-first to the ground when the suspect had committed a minor traffic violation, was cooperative, and was handcuffed); Jones v. Buchanan, 325 F.3d 520, 531 (4th Cir. 2003) (holding that jumping on an individual, knocking him to the ground, and breaking his nose was not objectively reasonable since the individual was not under arrest or suspected of any crimes, and was unarmed, handcuffed, and locked in a room by himself); Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002) (holding that slamming an individual's head against the trunk of a car after she was arrested and secured in handcuffs to be excessive); Mayard v. Hopwood, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (holding that slapping and punching an individual while she was handcuffed and in hobble restraints in the back of a

14

squad car was not objectively reasonable).  While none of the preceding cases is factually

identical to the instant case, together they establish that a reasonable officer would understand

that it is not objectively reasonable to take an individual face first to the ground when the

individual is handcuffed, not resisting arrest, and under control.[7]  Accordingly, the Fourth

Amendment right at issue here was clearly established.

Taking the facts alleged in the light most favorable to Meir, Officer McCormick used

objectively unreasonable excessive force in violation of Meir's clearly established Fourth

Amendment rights when he took a handcuffed and compliant Meir to the ground face first.

Accordingly, McCormick's Motion for Summary Judgment on qualified immunity grounds is

denied.

## C.     __Monell__[8]

The City argues that it can not be held liable under Section 1983 because there is no City

policy or custom that caused McCormick to use excessive force or unlawfully seize Meir.  The

City cites portions of the Chatfield Police Department's Policy and Procedure Manual ("the

Manual") that require an officer not to "knowingly take any action that will violate the

constitutional rights of any person," and that adopt an objective reasonableness standard for the

use of force.  McCormick Dep. Exs. 6-7.  The City also argues that there is no policy or custom

that requires deliberate indifference to citizen complaints, and relies on a portion of the Manual

---

[7] The fact context of the preceding cases does not include the suspects surrounded by a large crowd; however, it is unclear whether Meir was surrounded by a large hostile crowd. Although Meir certainly was not alone, the number of people standing outside the Coyote Club is highly disputed, and by all accounts, only two or three individuals were involved in the fight itself.

[8] Monell refers to Monell v. Department of Social Services, 436 U.S. 658 (1978).

that sets forth a policy of accepting and investigating all complaints of alleged police misconduct "in a fair and impartial manner."  McCormick Aff. [Docket No. 17] Ex. A.

Meir responds that the City is liable under Section 1983 because its written policy caused McCormick to violate Meir's Fourth Amendment and Fourteenth Amendment Due Process rights.[9]  Meir identifies Policy No. 1.01.22.09 in the Manual, which lists certain desirable characteristics that officers should have to limit liability.  Hiveley Aff. Ex. E.  Meir argues that Policy No. 1.01.22.09 empowers Chatfield officers to ignore their duty to uphold the Constitution and instead directs them to focus on personal civil liability limiting activities.  Meir argues that pursuant to Policy No. 1.01.22.09, McCormick ignored Derouin's criminal activities, included lies about Meir in his report, failed to include exculpatory witnesses and evidence in his report, and facilitated the false overcharging of Meir.  Meir argues that a fact issue exists as to whether the officers' compliance with Policy No. 1.01.22.09 caused the violation of Meir's Fourth Amendment right to be free from excessive force and Fourteenth Amendment Due Process Rights.

Under 42 U.S.C. § 1983, "a municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  "For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the moving force behind the constitutional violation."  Id. (quotation marks and citations omitted).  "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made

---

[9] Meir is "voluntarily limiting his Monell claim against the City of Chatfield to the claim arising out of the City's written policy regarding use of force."  Opp'n Mem. [Docket No. 19] at 31 n.6.

16

by the municipal official who has final authority regarding such matters." Id. "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving the issues of fault and causation is straightforward." Szabla v. City of Brooklyn Park, ___ F.3d ___, 2007 WL 1452595, at *3 (8th Cir. May 18, 2007) (en banc). "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." Id.

Policy No. 1.01.22.09 sets forth specific characteristics to help an officer to limit his or her exposure to liability. Hiveley Aff. Ex. E. The specific characteristics include "prepare all official reports with your legal risks in mind," "provide information that counters the tactics of adversarial attorneys," "articulate details and perceptions that defend your position," and "do and say things that will make you win on the street and in court." Id. The Court concludes that, accepting the facts alleged by Meir as true, a reasonable jury could find that McCormick's use of unreasonable force and subsequent "cover-up" that included naming Derouin as a victim, omitting Koons as a witness, including untruths in an official report, and overcharging Meir with criminal offenses flowed directly from the City's unconstitutional policy. The City's argument that another portion of the policy directs officers not to violate the constitutional rights of citizens does not cure the deficiencies of the policy directives clearly placing officer liability concerns above accuracy in report writing. Implicit in Policy No. 1.01.22.09 is that officers should do and say things that will limit their liability, regardless of the truth. This logical conclusion is borne out by McCormick's alleged actions in this case, such as omitting exculpatory details and including unsupported facts. A jury could conclude that McCormick used excessive force in taking Meir face first to the ground, knowing that he could later falsify

17

reports and facilitate criminal charges without supporting evidence against Meir in order to limit his liability, relying on the directions of the Chatfield Police Department's Policy and Procedure Manual.  Accordingly, summary judgment for the City is denied and Meir's <u>Monell</u> claim should remain for trial.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 12] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 15, 2007.